[Cite as *State v. Powell*, 2019-Ohio-4345.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 107276 |
| CARLIN POWELL, | : | |
| Defendant-Appellant. | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 24, 2019

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-15-598275-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Mary M. Frey, Assistant Prosecuting Attorney, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and Erika Cunliffe, Assistant Public Defender, *for appellant.*

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant, Carlin Powell, appeals from his convictions following a jury trial. He raises the following assignments of error for review:

1. Tina Stewart's testimony detailing evidence collection by a forensic scientist who has since been fired for misconduct violated Powell's right to confrontation and the state rules of evidence which bar such hearsay.

2. Powell's rights to due process and a fundamentally fair trial were compromised by the jury's improper exposure to evidence of a third victim who the state did not call as a witness.

3. Powell was deprived of his Sixth Amendment right to the effective assistance of counsel.

{¶ 2} After careful review of the record and relevant case law, we affirm Powell's convictions.

## I. Procedural and Factual History

{¶ 3} In August 2015, Powell was named in a seven-count indictment, charging him with rape in violation of R.C. 2907.02(A)(2) (Count 1); kidnapping in violation of R.C. 2905.01(A)(4) (Count 2); rape in violation of R.C. 2907.02(A)(2), with a sexually violent predator specification (Count 3); kidnapping in violation of R.C. 2905.01(A)(4), with sexual motivation and sexually violent predator specifications (Count 4); rape in violation of R.C. 2907.02(A)(2), with a sexually violent predator specification (Count 5); corruption of a minor in violation of R.C. 2907.04(A) (Count 6); and kidnapping in violation of R.C. 2905.01(A)(4), with sexual motivation and sexually violent predator specifications (Count 7). The indictment stemmed from allegations that Powell sexually assaulted three victims: (1) M.S., with the offenses occurring on or about September 20, 1997 (Counts 1 and 2); (2) D.E., with the offenses occurring on or about January 15, 1997 (Counts 3 and 4); and (3) A.W., with the offenses occurring on or about November 16, 1998 (Counts 5-7).

{¶ 4} In November 2016, Powell filed a motion to dismiss for preindictment delay, arguing that he was prejudiced by the unjustifiable delay between the alleged commission of the offenses and the time he was indicted. Following a hearing, the trial court denied Powell's motion to dismiss. In January 2018, the matter proceeded to a jury trial.[1]

{¶ 5} At trial, A.W. testified that when she was 15 years old, she was walking to school on the morning of November 16, 1998. As she was walking, a vehicle containing two men pulled up next to her. A.W. testified that she knew the driver of the vehicle from the neighborhood. A.W. described the driver as a bald man with brown hair and a beard. She described the passenger as being a dark-skinned man with dreadlocks. A.W. stated that she was speaking with the driver when she was suddenly pulled inside the vehicle by the man in the passenger's seat. A.W. testified that she was scared and did not feel free to leave the vehicle.

{¶ 6} At some point, A.W. fell asleep while she was inside the vehicle. When she woke up, A.W. was at an unfamiliar house. A.W. testified that she could not remember specific details about the house, but recalled seeing people inside who seemed "drugged up." A.W. believed that she may have been drugged herself, and that she remained in the house for "maybe three days." While inside the home, A.W. alleged that she was forced to have nonconsensual vaginal sex with the bearded man, who she identified at trial as being Powell. When A.W. was eventually able to leave

---

[1] The sexually violent predator specifications associated with Counts 3, 4, 5, and 7 were tried to the bench.

the house, she went to the nearest payphone and called her grandfather. She was subsequently taken to the hospital where a sexual assault kit was collected. A.W. recalled the police retrieving her clothing as potential evidence. However, A.W. could not remember whether she spoke to a police officer about the incident.

{¶ 7} In 2015, A.W. was contacted by Investigator Nicole DiSanto to discuss the November 1998 incident. During this meeting, A.W. was shown a photo array by a blind administrator. A.W. testified that she identified Powell's photograph from the photo array and wrote that she was "a hundred percent sure" he was the person who sexually assaulted her.

{¶ 8} During her cross-examination, defense counsel thoroughly questioned A.W. about perceived inconsistencies between her trial testimony and the statements she initially made to law enforcement and medical personnel. A.W. was shown a copy of her police report, marked defendant's Exhibit A. The relevant inconsistencies between A.W.'s testimony and the information contained in the police report included (1) A.W.'s description of the vehicle that pulled up beside her, (2) A.W.'s accounting of the number of individuals inside the vehicle, (3) A.W.'s description of the vehicle, (4) A.W.'s physical description of the perpetrators (5) the location of the alleged sexual assault, (6) A.W.'s description of the assault, (7) A.W.'s accounting of the number of individuals who perpetrated the alleged sexual assault, and (8) the actions A.W. took before returning home. A.W. testified that she disagreed with many of the statements contained in the police report, but qualified her testimony, stating "then again, it happened 20 years ago."

{¶ 9} Captain Renee Kane of the Cleveland Police Department testified that at approximately 1:30 a.m. on November 17, 1998, she responded to a missing persons report filed by A.W.'s mother. Captain Kane stated that she generated a missing persons report and initiated an investigation to locate A.W., which proved unsuccessful. However, the Cleveland police were notified on November 19, 1998, that A.W. was located by her family.

{¶ 10} Retired Cleveland police officer, Matthew Stepic, testified that he responded to MetroHealth Medical Center for the reported rape of A.W. Officer Stepic testified that he interviewed A.W. about the incident and collected her sexual assault kit, which he transported to the police department's property room. Officer Stepic then completed a written police report.

{¶ 11} D.E. testified that in January 1997, she met Powell at a convenient store near the apartment she shared with her sister. After having a conversation and smoking marijuana together, D.E. and Powell exchanged phone numbers and agreed to meet up again. Approximately one week later, Powell picked D.E. up in his vehicle. D.E. stated that Powell had a friend with him in the car. She described the friend as a white man with curly blonde hair. Powell then drove to a home located in Cleveland, Ohio. Powell and D.E. went inside the home, while Powell's friend remained in the car.

{¶ 12} Once inside the home, D.E. and Powell began smoking marijuana. D.E. stated that there were two other individuals with them at the time. However, after a period of time, the other two individuals went upstairs, leaving D.E. and

appellant alone.  D.E. testified that Powell suddenly reached over and grabbed her by the neck.  D.E. described the incident as follows:

> I was startled, because I really didn't know what was going on.  And I was trying to push him away to stop and he pushed me down.  He had me by my neck and he had my arms.  He was quite bigger than me. And I started to try to scream for the other people who were in the house to come down and help me.  So I began to yell for some help, like "Please help me," you know, "I need help, I need help, I need help."  Nobody came.  I started to fight with him to try to get him off of me and he just kept squeezing harder, and he said that if I kept fighting that he was going to hurt me, he was going to beat me up, and he wasn't going to stop.  So I kind of relaxed and he started to undress me and also, you know, himself, and he began to penetrate me.

> * * *

> He had me, he was holding me tightly, and, you know, he told me, "You shut the fuck up.  You're not leaving here."  I did not feel that I had a choice.  So after that had happened and I kept asking him to please stop and he told me to shut the fuck up, he hit me in the face and it was done.  He just got up off of me. And I was sobbing and crying and — I don't really know what I thought was going to happen next.  I got up and I moved away from him.

{¶ 13}  D.E. clarified that Powell held her down and penetrated her vagina with his penis.  When she returned home, D.E. immediately told her sister that she had been raped and went to the hospital for medical examination, where a sexual assault kit was completed.

{¶ 14}  D.E. testified that a Cleveland police detective arrived at her home the next day to take a statement.  D.E. admitted that she initially told detectives that the rape occurred inside Powell's vehicle.  D.E. further conceded that she did not tell detectives about smoking marijuana with Powell.  She explained that she did not tell the police the complete truth because she blamed herself for what happened, did not

want her father to know she was smoking marijuana, and did not want to be "looked at differently" for going to a place she did not know with a person she had just met.

{¶ 15} Years later, D.E. was contacted by Investigator Nicole DiSanto to discuss the January 1997 incident. During this meeting, D.E. was shown a photo array by a blind administrator. D.E. testified that she identified Powell as the person who sexually assaulted her. D.E. stated that she knew it was Powell "immediately when [she] saw [the photo array]."

{¶ 16} During her cross-examination, D.E. was confronted with inconsistencies between her trial testimony and her initial statement to the police and medical personnel. In relevant part, the records indicated that (1) D.E. stated that she met Powell at a K-Mart, rather than a local convenience store; (2) D.E. described the passenger in Powell's vehicle as a black male; (3) Powell kissed her in the back seat of the vehicle; and (4) that the sexual assault occurred inside the vehicle. Defense counsel also referenced D.E.'s criminal history and police records indicating that D.E. failed to appear for an appointment to further discuss the incident.

{¶ 17} Retired sex-crimes detective, Sgt. Michael Kmiecik of the Cleveland Police Department, testified that he conducted a field interview of D.E. in 1997. He testified that he had no independent recollection of the conversation. However, having reviewed the police report, Sgt. Kmiecik testified that when the information gathered from the interview with D.E. was presented to the prosecutor, it was determined that there was "insufficient evidence to sustain a charge or to have

probable cause to charge anyone at that time." Accordingly, the file pertaining to D.E. was marked as "no further investigation leads at this time." During his cross-examination, Sgt. Kmiecik testified that in 2007, a follow-up detective reached out to D.E. "after getting a hit on DNA." Sgt. Kmiecik stated that the follow-up detective made contact with D.E. and scheduled an appointment to further discuss her case. However, D.E. was "a no-show for the appointment" and her case was closed following a consultation with the prosecutor.

{¶ 18} Nicole DiSanto is employed as an investigator by the Cuyahoga County Prosecutor's Office. DiSanto testified that she began investigating the sexual assault of A.W. after the prosecutor's office received information linking Powell's DNA to the DNA recovered from A.W.'s sexual assault kit. Upon receiving this information, DiSanto reviewed the original police report and contacted A.W. about the incident. DiSanto testified that, before discussing the facts and circumstances of the incident with A.W., a blind administrator presented A.W. with a photo array. DiSanto stated that A.W. identified Powell as her attacker and confirmed that the incident was not a consensual encounter.

{¶ 19} DiSanto testified that she also travelled to North Carolina to conduct a recorded interview with Powell regarding his recollection of A.W. According to DiSanto, Powell admitted that he "[knew] her from the neighborhood." However, he denied having sex with A.W. and stated that he would not have been having sex with a 15-year old when he was 21-years old.

{¶ 20} DiSanto also testified at trial regarding her investigation of the sexual assault committed against D.E. She stated that she began investigating the case after the prosecutor's office received a DNA hit linking Powell's DNA to the DNA recovered from D.E.'s sexual assault kit. Upon receiving this information, DiSanto interviewed D.E. in April 2015. During the interview, D.E. was forthright, emotional, and told DiSanto right away that she had originally lied to the police about the circumstances of the sexual assault when she was 16-years old. DiSanto stated that a blind administrator presented D.E. with a photo array and that D.E. "was able to identify Carlin Powell as her attacker." DiSanto testified that she also conducted an interview with Powell regarding his interactions with D.E. DiSanto testified that Powell stated that he could not remember D.E.'s face. He further denied having intercourse with D.E.

{¶ 21} When confronted with the DNA evidence obtained from A.W.'s and D.E.'s sexual assault kits, Powell denied ever raping anyone. However, Powell also testified that "he was doing drugs and everything and doesn't remember anything" from the relevant time period. DiSanto further testified that "as soon as DNA was brought up, he said, 'Well, it was on her panties.'" When DiSanto asked why he would be specific about panties, Powell stated, "Well, because that's where it would leak out and that's where someone's semen would go if they had sex." At the conclusion of the interview, Powell consented to a buccal swab, which was submitted to the Ohio Bureau of Criminal Investigation for comparison to the evidence contained in A.W.'s and D.E.'s sexual assault kits.

{¶ 22} Tina Stewart testified that she was formerly employed as a scientific examiner with the Cleveland Police forensics laboratory. Stewart worked in the serology section of the forensic laboratory during the time period when D.E.'s and A.W.'s sexual assault kits and clothing were first analyzed. Stewart provided extensive testimony regarding the chain of custody protocol and procedures utilized by the forensic laboratory.

{¶ 23} Stewart explained that when evidence was delivered to the laboratory for testing, the evidence was assigned a six-digit number that was unique to that piece of evidence. A forensic analyst would then generate a "matching [laboratory] card with the same laboratory number, and on that card would have information about that evidence." Stewart testified that when the forensic analysis was completed, the results of the testing would be written on the front side of the corresponding laboratory card. If evidence submitted to the laboratory tested positive for blood or semen, the evidence would be placed in an individually sealed envelope, marked with the unique six-digit number previously assigned to that evidence, and stored in the laboratory in case further testing was required. The remaining evidence was transported to the Cleveland Police property room.

{¶ 24} Stewart also testified regarding the procedure that was utilized for testing evidence, including the steps taken to prevent the contamination of evidence. She explained, in relevant part:

> The analysts changed their gloves between different evidence, and then when the evidence was finished being analyzed it would be sealed with evidence tape. And also, on the back of the [laboratory] cards we have

the chain of custody listed where the evidence has been, so we have a written copy of where all the evidence has gone.

If evidence came into the laboratory unsealed or with a broken seal, that information would be noted by the analyst on the laboratory card.

{¶ 25} Regarding D.E.'s case, the state presented Stewart with D.E.'s forensic laboratory report, marked state's exhibit No. 25. Stewart testified that D.E.'s sexual assault kit and clothing were submitted to the laboratory on January 17, 1998. The evidence was assigned a unique six-digit number. Stewart testified that state's exhibit No. 25 is a copy of the laboratory card used by the analysts to record all pertinent information about the tested evidence. Stewart explained that the front side of the laboratory card contained the results of the serology testing and the initials of the analysts who performed the serology testing. In turn, the back of the card listed the evidence submitted to the laboratory and the chain of custody log. Stewart then identified each piece of evidence submitted to the laboratory for testing in D.E.'s case. She also discussed the custodial history of the relevant evidence by referencing the chain of custody information delineated on the back of the laboratory card. Stewart clarified that she was not the primary analyst assigned to conduct the forensic analysis in D.E.'s case.

{¶ 26} Regarding the serology testing performed on the evidence submitted in A.W.'s case, the state presented Stewart with A.W.'s forensic laboratory report, marked state's exhibit No. 26. Stewart testified the A.W.'s rape kit and clothing were submitted to the laboratory on November 23, 1998. The evidence was assigned a

unique six-digit number. Stewart testified that state's exhibit No. 26 is a copy of the laboratory card, which also listed the evidence tested, the results of the serology testing, and the relevant chain of custody information. Stewart identified the evidence that was submitted to the laboratory for testing and discussed the custodial history of the relevant evidence by referencing the chain of custody information delineated on the back of the laboratory card. Stewart confirmed that she did not perform the serology testing in A.W.'s case.

{¶ 27} During her cross-examination, Stewart was questioned extensively about the possibility of evidence being contaminated due to the procedures used in 1998 that are no longer standard practice. For instance, Stewart conceded that the laboratory received most of D.E.'s hospital clothing in a single bag. While Stewart indicated that D.E.'s underwear was stored separately, she agreed that placing all of D.E. remaining clothing in one bag would not comply with current standard procedures. In addition, Stewart admitted that the laboratory reports did not specify the tests that were performed on the evidence collected. Stewart was also questioned at length about the primary analyst who worked on both D.E. and A.W.'s cases. Stewart testified that the analyst, J.M.S., was subsequently fired, then reinstated, by the laboratory "because they thought he did an error with one of his statistics," resulting in the reversal of a criminal conviction in an unrelated case.

{¶ 28} During her direct examination, Stewart did not provide any testimony regarding the results of the serology testing that was performed in each case. However, during her cross-examination, Stewart was asked for the first time to

discuss the results of the testing in D.E.'s case. Relevant to this appeal, Stewart confirmed that D.E.'s vaginal swabs tested negative for semen and blood; her vaginal smear slides tested negative for spermatozoa; the "outside area of rear of blue and black panties" tested positive for seminal fluid; and the "seat area of jeans, stain on right front leg of jeans" tested positive for seminal fluid. On redirect examination, Stewart reiterated the results of D.E.'s serology tests and explained the nature of the forensic tests that were performed in each case.

{¶ 29} Heather Bizub, a DNA analyst for the Bureau of Criminal Identification, testified that she compared the DNA derived from Powell's buccal swab to the biological evidence extracted from D.E.'s sexual assault kit and the clothing collected from her at the hospital. Her findings were reduced to a DNA report, dated September 11, 2015. Bizub testified that D.E.'s vaginal swab contained a mixture of DNA, with D.E. being a major contributor, as well as male DNA. However, Bizub explained that the data was insufficient for her to make a comparison or draw a conclusion regarding the male contributor. Thus, Bizub stated that she could not provide an opinion as to whether Powell was the minor contributor. Regarding bodily fluid extracted from a cutting of D.E.'s underwear, Bizub testified that Powell was identified as the sole contributor. She stated, to a reasonable degree of scientific certainty, that the frequency of a similar DNA appearing was one in 27 quadrillion-60 trillion unrelated individuals.

{¶ 30} Bizub testified that she was also involved in the DNA testing performed on the evidence submitted in A.W.'s case. Bizub stated that she

compared the DNA derived from Powell's buccal swab to the biological evidence extracted from A.W.'s sexual assault kit. Her findings were reduced to a DNA report, dated September 14, 2015. Bizub testified that an anal sample taken from A.W. contained a mixture of DNA, with A.W. being a major contributor. The sample contained male DNA, but the profile was insufficient for Bizub to render a conclusion about the source of the minor contributor. However, Bizub testified that she identified Powell as a contributor to the seminal fluid mixture extracted from A.W.'s pubic hair combings, a vaginal swab, and two separate skin swabs. Bizub stated, to a reasonable degree of scientific certainty, that for the pubic hair combings the frequency of a similar DNA appearing was one in 533 trillion unrelated individuals. For the vaginal swab, the frequency was one in 36 quintillion-310 quadrillion unrelated individuals. For the first skin swab, the frequency was one in 36 quintillion unrelated individuals. Finally, for the second skin swab, the frequency was one in 36 quintillion-310 quadrillion unrelated individuals.

{¶ 31} M.S. did not appear for trial. Accordingly, the trial court granted the state's motion to dismiss Counts 1 and 2 of the indictment, which correlated to the conduct alleged to have been committed against M.S. Defense counsel rested without presenting any witnesses.

{¶ 32} At the conclusion of trial, the jury found Powell guilty of Count 3, the rape of D.E.; Count 4, the kidnapping of D.E., with the sexual motivation specification; and Count 6, corruption of a minor involving A.W. Powell was found not guilty of the rape and kidnapping offenses alleged to have been committed

against A.W. The trial court further found Powell not guilty of the sexually violent predator specifications that were attached to Counts 3 and 4.

{¶ 33} At the sentencing hearing, the trial court found that the rape and kidnapping offenses committed against D.E. were allied offenses of similar import. The state elected to proceed with sentencing on the rape offense, and the trial court imposed a nine-year term of imprisonment. The trial court then imposed an 18-month term of imprisonment on the corruption of a minor offense, to run consecutively to the rape offense, for an aggregate prison term of 10 years and six months.

{¶ 34} Powell now appeals from his convictions.

## II. Law and Analysis

### A. Hearsay and the Confrontation Clause

{¶ 35} In his first assignment of error, Powell argues Tina Stewart's testimony relied on hearsay statements and violated his right to confrontation. He contends that Stewart's testimony was not based on her own personal knowledge, and relied on reports that "lacked the trustworthiness required for admissibility under Evid.R. 803(6)."

{¶ 36} Powell did not object to Stewart's testimony or the admission of the forensic lab records, marked state's exhibits Nos. 25 and 26. He has therefore waived all but plain error. Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Plain error exists when it can be said that but for the error, the outcome

of the trial would clearly have been otherwise." *State v. Issa*, 93 Ohio St.3d 49, 56, 752 N.E.2d 904 (2001), citing *State v. Moreland*, 50 Ohio St.3d 58, 62, 552 N.E.2d 894 (1990).

{¶ 37} The Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Further, Section 10, Article I of the Ohio Constitution provides that "[i]n any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face * * *."

{¶ 38} "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Pursuant to Evid.R. 802, hearsay is inadmissible unless it falls within one of the exceptions listed in Evid.R. 803. Whenever the state seeks to introduce hearsay into a criminal proceeding, the court must determine not only whether the evidence fits within an exception, but also whether the introduction of such evidence offends an accused's right to confront witnesses against him. *State v. Kilbane*, 8th Dist. Cuyahoga No. 99485, 2014-Ohio-1228, ¶ 29.

{¶ 39} The Confrontation Clause prohibits the admission of an out-of-court statement of a witness who does not appear at trial if the statement is testimonial, unless the defendant has had an opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). "Testimonial" statements generally include hearsay statements "'made

under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Id.* at 52, quoting the amicus brief of the National Association of Criminal Defense Lawyers. In determining whether a statement is testimonial for purposes of the Confrontation Clause, "'courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations.'" *State v. Thomas*, 8th Dist. Cuyahoga No. 101202, 2015-Ohio-415, ¶ 21, quoting *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, paragraph two of the syllabus.

{¶ 40} The Confrontation Clause does not bar the admission of hearsay statements that are not testimonial. *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 21. Indeed, where nontestimonial hearsay is at issue, the Confrontation Clause is not implicated and need not be considered. *Whorton v. Bockting*, 549 U.S. 406, 420, 127 S.Ct. 1173, 167 L.E.2d 1 (2007).

{¶ 41} In this case, the challenged testimony concerns Stewart's references to the forensic laboratory reports generated in each case. The exhibits contain a photocopy of the front and back of the laboratory cards described by Stewart during her direct examination. The front side of the card, labeled "Forensic Laboratory Report," lists, in relevant part (1) the name of the victim, (2) a general description of the evidence submitted for testing, (3) the six-digit number assigned to the evidence, (4) the date the evidence was submitted to the laboratory, (5) the results of the forensic testing, and (6) the initials of the analyst or analysts who performed the

forensic testing.  In turn, the back side of the card provides a detailed description of each piece of evidence submitted for testing, and lists the chain of custody history of the evidence, including dates and signatures that correspond to when, where, and by whom the evidence was moved.  Significantly, the forensic laboratory report was generated before Powell was identified as a suspect.  Thus, the report does not identify Powell as the source of the seminal fluid discovered in each case.

{¶ 42} On appeal, Powell asserts that Stewart "did not personally examine any of the physical evidence, nor did she come to any independent conclusion therefrom." Referencing the scientific conclusions reached in each laboratory report, Powell contends he was unconstitutionally prevented from cross-examining the lead analyst, J.M.S., about the testimonial "analyses and conclusions he reached" in each case.  Thus, Powell argues the trial court circumvented his constitutional right to confrontation by permitting Stewart to authenticate the laboratory records.

{¶ 43} For the purposes of clarity, we begin our analysis by addressing the admissibility of the information contained on the front side of each forensic laboratory card, including the results of the serology tests performed in each case. Relevant to this issue are several decisions rendered by the United States Supreme Court.

{¶ 44} In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the trial court admitted into evidence three "certificates of analysis" setting forth "the results of forensic analysis which showed that material

seized by the police and connected to the defendant was cocaine." *Melendez-Diaz*, 557 U.S. at 307, 308. The trial court admitted the notarized certificates, without live testimony, "pursuant to state law as prima facie evidence of the composition, quality, and the net weight of the narcotic analyzed." *Id.* at 309. After he was convicted, the defendant appealed, arguing "that admission of the certificates violated his Sixth Amendment right to be confronted with the witnesses against him." *Id.*

{¶ 45} In a five-to-four decision, the United States Supreme Court reversed the defendant's conviction, holding that the notarized certificates fell "within the core class of testimonial statements" because they were "quite plainly affidavits: declarations of facts written down and sworn to by the declarant before an officer authorized to administer oaths." *Id.* at 310 The court explained that the analysts' affidavits were introduced into evidence for the purpose of proving the truth of what they asserted, specifically that the substance in question contained cocaine:

> The fact in question is that the substance found in the possession of Melendez-Diaz * * * was, as the prosecution claimed, cocaine — the precise testimony the analysts would be expected to provide if called at trial. The "certificates" are functionally identical to live, in-court testimony, doing "precisely what a witness does on direct examination."

*Id.* at 310-311, quoting *Davis v. Washington*, 547 U.S. 813, 830, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Thus, "[a]bsent a showing that the analysts were unavailable to testify at trial and that [the defendant] had a prior opportunity to cross-examine them, [he] was entitled to 'be confronted with' the analysts at trial." *Id.* at 311, quoting *Crawford*, 541 U.S. 36, at 54, 124 S.Ct. 1354, 158 L.Ed.2d 177. The court

further rejected the respondent's argument that the analysts' affidavits are admissible without confrontation because they are "akin to the types of official and business records admissible at common law." The court stated, in relevant part:

> Whether or not [the affidavits] qualify as business or official records, the analysts' statements here — prepared specifically for use at petitioner's trial — were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment.

*Id.* at 324.

{¶ 46} In *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the Supreme Court was confronted with a situation where one forensic analyst prepared and certified a report determining the defendant's blood-alcohol concentration, but another analyst, who was not involved in the analysis of the defendant's blood, introduced the report at trial. Although the witness was a "knowledgeable representative of the laboratory" who could "explain the lab's processes and the details of the report," *id.* at 2723 (Kennedy, J., dissenting), the majority held that the surrogate witness was not a proper substitute for the analyst who had conducted the test. Thus, the Supreme Court found the admission of the evidence to be a violation of the confrontation clause, stating:

> The question presented is whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification — made for the purpose of proving a particular fact — through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification. We hold that surrogate testimony of that order does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist.

*Id.* at 2710.

{¶ 47} Shortly after *Bullcoming,* the Supreme Court decided *Williams v. Illinois*, 567 US. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), a divided opinion that involved a rape prosecution. At trial, an expert testified she obtained a DNA profile report from an independent lab based on a semen specimen taken from a vaginal swab of the victim. The lab report was not introduced into evidence, but the expert testified she compared the DNA profile contained in the lab report to the defendant's recorded DNA profile and concluded it was a match. The defendant challenged the expert's testimony that relied upon the lab report on the basis the report's admission without testimony from its author violated the Confrontation Clause.

{¶ 48} The plurality opinion relied in part on Federal Rule of Evidence 703 and held, "[o]ut-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." *Id.* at 58. Alternatively, the plurality applied the primary purpose test to conclude the underlying lab report was itself nontestimonial, and thus beyond the reach of the Confrontation Clause, because the report did not identify the defendant, was not inherently inculpatory, and was created "before any suspect was identified." *Id.* The report "was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose." *Id.* The plurality thus opined the lab report differed from the certificates of analysis and reports disputed in *Melendez-Diaz* and

*Bullcoming*, which were created for the sole purpose of providing evidence against a particular defendant and were used to establish the truth of the matter asserted. *Id.* at 2242.

{¶ 49} In this case, it is undisputed that Stewart was not the primary analyst in either case and, in fact, had no involvement in the forensic analysis performed in A.W.'s case. With that said, however, we find the nature and scope of Stewart's testimony to be distinguishable from evidence challenged in *Melendez-Diaz* and *Bullcoming*. As noted in *Melendez-Diaz*, "it is the obligation of the prosecution to establish the chain of custody for evidence sent to testing laboratories — that is, to establish 'the identity and integrity of physical evidence by tracing its continuous whereabouts.'" *Id.*, 557 U.S. 305, at 335, 129 S.Ct. 2527, 174 L.Ed.2d 314 (Kennedy, J., dissenting). Here, the state's sole purpose of presenting Stewart as a prosecution witness was to authenticate the laboratory's chain of custody records. Significantly, Stewart provided no testimony during her direct examination regarding the nature of the serology tests performed or the scientific conclusions reached by the lead forensic analyst in each case.

{¶ 50} Under these circumstances, we find Stewart's testimony, and her reliance on the challenged forensic reports, was not offered for the truth of the scientific conclusions reached by other analysts in the forensic laboratory. As stated, Stewart provided no testimony during her direct examination regarding the results of the serology tests performed in each case, nor did she offer an opinion regarding the scientific accuracy of those results. In addition, there is no indication in this

record to suggest the challenged forensic laboratory reports were published to the jury during Stewart's testimony. Thus, information concerning the presence of seminal fluid on clothing submitted in D.E.'s case had not been provided to the jury until defense counsel questioned Stewart about the specific results of the forensic testing during her cross-examination. Defense counsel thus invited the testimony now complained of on appeal. *State v. Seiber*, 56 Ohio St.3d 4, 17, 564 N.E.2d 408 (1990) ("A party cannot take advantage of an error he invited or induced.").

{¶ 51} It is evident that defense counsel questioned Stewart about the results of the serology testing in an effort to (1) challenge the reliability of J.M.S.'s laboratory work, and (2) suggest the seminal fluid discovered on D.E.'s clothing was caused by cross-contamination and/or inadequate testing procedures. This was a strategic decision by defense counsel that intended to challenge the weight of the subsequent DNA evidence. Nevertheless, any potential hearsay or confrontation arguments concerning Stewart's testimony about the nature of the serology tests performed, or the scientific conclusions rendered in the forensic laboratory reports, was invited error. The challenged exhibits were only offered into evidence after defense counsel opened the door, thereby permitting the state to further develop the record about the results of the serology testing performed by Stewart's colleagues.

{¶ 52} Moreover, even if we were to conclude that the trial court's admission of the serology results violated Evid.R. 803 and/or the Confrontation Clause, Powell has not demonstrated plain error. The results of the serology testing were minimally probative when compared to the subsequent DNA testing that identified Powell as a

contributor to the DNA profiles discovered in the victim's biological evidence. Notwithstanding his references to the lead analysts' past misconduct in an unrelated case, Powell has provided no basis to conclude that the laboratory's custodial and testing procedures compromised the integrity or accuracy of the subsequent DNA analysis.

{¶ 53} With respect to the admission of the remaining portions of the forensic laboratory report, including the inventory of evidence and chain of custody log reflected on the back side of the laboratory card, we find no error.

{¶ 54} Evid.R. 803(6) creates a hearsay exception for "records of regularly conducted activity." This rule excepts business records from exclusion at trial if they are made in the course of a regularly conducted business activity "because the courts presume that such records are trustworthy given the self-interest to be served by the accuracy of such entries." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 21, citing *Weis v. Weis*, 147 Ohio St. 416, 425-426, 72 N.E.2d 245 (1947).

{¶ 55} In order to qualify for the business-records exception, a record must meet the following criteria (1) the record must be one recorded regularly in a regularly conducted activity; (2) a person with knowledge of the act, event, or condition recorded must have made the record; (3) it must have been recorded at or near the time of the act, event, or condition; and (4) the party who seeks to introduce the record must lay a foundation through testimony of the record custodian or some other qualified witness. *State v. Boiani*, 8th Dist. Cuyahoga No. 98314, 2013-Ohio-

1342, ¶ 29, citing *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 171.

{¶ 56} The phrase "other qualified witness" does not necessarily mean that the witness must have firsthand knowledge of the transaction giving rise to the record. *State v. Sherrills*, 8th Dist. Cuyahoga No. 89844, 2008-Ohio-1950, ¶ 31; citing *State v. Vrona*, 47 Ohio App.3d 145, 547 N.E.2d 1189 (9th Dist.1988).

> Rather, it must be demonstrated that the witness is sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance, and retrieval, that he can reasonably testify on the basis of this knowledge that the record is what it purports to be, and that it was made in the ordinary course of business consistent with the elements of Rule 803(6).

*Sherrills* at *id.*, citing *State v. Shaheen*, 3d Dist. Hancock No. 5-97-03, 1997 Ohio App. LEXIS 3487 (July 29, 1997); *State v. Patton*, 3d Dist. Allen No. 1-91-12, 1992 Ohio App. LEXIS 997 (Mar. 5, 1992).

{¶ 57} Based on Stewart's experience and knowledge concerning the procedures and standards followed by the forensic laboratory, we find no abuse of discretion in allowing her, a qualified witness, to identify and authenticate the itemized list of submitted evidence and the chain of custody logs. Here, Stewart provided extensive testimony concerning her employment history in the serology department of the forensic laboratory. Stewart stated that she worked in the department at the time the evidence pertaining to the victims was submitted to the laboratory, and had firsthand knowledge of the laboratory's custodial procedures and chain-of-custody protocol. During her direct examination, Stewart explained

how evidence is received, maintained, and cataloged in the laboratory's ordinary course of business. Stewart described the methods utilized by the forensic analysts to prevent evidence contamination, and generally described the type of information that would be chronicled by the analyst in the laboratory report. Regarding the reports generated in A.W.'s and D.E.'s cases, Stewart discussed the scope of the information set forth in each report and stated that the information was contemporaneously recorded in the laboratory's regular course of business.

{¶ 58} In an effort to challenge the trustworthiness of the relevant records, Powell again relies on Stewart's testimony that the primary analyst, J.M.S., was fired from the laboratory after a rape conviction was reversed due to his statistical error. However, Evid.R. 803(6) contemplates the trustworthiness of specific exhibits at the time they were made. *Bank of N.Y. Mellon v. Broyles*, 7th Dist. Mahoning No. 16-MA-0093, 2018-Ohio-357, ¶ 16. Here, the circumstances relied upon by Powell provide no basis to suggest that the itemized list of evidence or the chain-of-custody logs were inaccurate or fraudulently maintained. A conclusion to the contrary would require this court to rely on speculative arguments concerning J.M.S.'s character and past actions in an unrelated case.

{¶ 59} Accordingly, we find no error in the acceptance of Stewart's testimony or the court's admission of the corresponding records. The chain of custody logs constituted reliable, nontestimonial hearsay that qualifies for the business-record exception under Evid.R. 803(6). In addition, we find no Confrontation Clause violation. We recognize that whether a business record meets a hearsay exception

is immaterial in regard to the Confrontation Clause; it is the nontestimonial character of the record that removes it from the purview of the Confrontation Clause. As the United States Supreme Court has explained:

> Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial.
>
> *Melendez-Diaz*, 557 U.S. 305, at 324, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). However, in this case, the list of evidence and chain of custody logs were not prepared for the purpose of proving a fact at trial. Indeed, the evidence logs do not purport to prove any fact necessary to the conviction. Rather, the information was documented by the laboratory in an effort to catalog the evidence in a secure and reliable fashion.

{¶ 60} Powell's first assignment of error is overruled.

### B. State's References to M.S.

{¶ 61} In his second assignment of error, Powell argues his "rights to due process and a fundamentally fair trial were compromised by the jury's improper exposure to evidence of a third victim who did not testify at trial." Powell contends that the state's use of evidence relating to M.S. amounted to prosecutorial misconduct that deprived him of his constitutional right to a fair trial.

{¶ 62} In this case, the record reflects that the state alluded to the allegations of rape and kidnapping committed against M.S. during voir dire, expressing to the jury that three rapes occurred in three different years. In addition, the prosecution described the factual circumstances supporting the charges relating to M.S. during its opening statements and indicated that the jury would be hearing from each of the three victims during the trial. Finally, the record reflects that the state elicited direct

examination testimony from Tina Stewart regarding her involvement in M.S.'s case. However, before Stewart was permitted to testify about M.S.'s rape kit, which was submitted to the forensic laboratory on September 27, 1995, the trial court prevented further testimony regarding M.S. and her rape kit until "M.S. makes herself available."

{¶ 63} On appeal, Powell argues the prosecution's repeated references to M.S. amounted to prosecutorial misconduct, as the state had reason to believe that M.S. would not appear as a witness. According to Powell, "the information surrounding M.S. * * * unjustifiably bolstered the evidence supporting the other rape allegations," and "allowed the state to establish a pattern where they otherwise could not have done so."

{¶ 64} "The test for prosecutorial misconduct is whether the prosecutor's remarks were improper and, if so, whether they prejudicially affected the substantial rights of the accused. The touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor." *State v. Eisermann*, 8th Dist. Cuyahoga No. 100967, 2015-Ohio-591, ¶ 43. Prosecutorial misconduct constitutes reversible error only in rare cases. *State v. Keenan*, 66 Ohio St.3d 402, 405, 613 N.E.2d 203 (1993).

{¶ 65} Under the circumstances presented in this case, we find the state's references to M.S. during trial did not amount to prosecutorial misconduct that deprived Powell of his constitutional rights to due process and a fair trial. Following the state's attempt to question Stewart about her involvement in M.S.'s case, an extensive conversation was held outside the presence of the jury. At that time, the

state admitted that M.S. had missed her scheduled flight and was not in Cuyahoga County. However, the prosecutor indicated that the state intended to work with M.S. to reschedule her flight before the trial concluded. Thus, at the time the vague references to M.S. were made, the prosecutor had a good-faith basis to expect M.S. would appear and testify at trial. Once it became apparent that the victim would not appear for trial, the state properly dismissed the counts related to M.S. Moreover, the record reflects that the trial court sufficiently protected Powell's constitutional rights and presumption of innocence by preventing the state from developing specific testimony regarding the allegations of sexual assault committed against M.S. until she appeared for trial.

{¶ 66} Powell's second assignment of error is overruled.

### C. Ineffective Assistance of Counsel

{¶ 67} In his third assignment of error, Powell argues defense counsel rendered ineffective assistance of counsel by (1) failing to seek severance of the three separate sexual misconduct incidents, and (2) failing to renew or file a motion to dismiss this prosecution for preindictment delay that more specifically alleges the evidence lost as a result of the delay.

{¶ 68} To establish a claim for ineffective assistance of counsel, Powell must show that his trial counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). To establish prejudice, the defendant must demonstrate there

is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694.

{¶ 69} In evaluating a claim of ineffective assistance of counsel, a court must give great deference to counsel's performance. *Id.* at 689. "A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69. Thus, "[t]rial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel." *State v. Foster*, 8th Dist. Cuyahoga No. 93391, 2010-Ohio-3186, ¶ 23, citing *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980). Additionally, the failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial. *Kilbane*, 8th Dist. Cuyahoga No. 99485, 2014-Ohio-1228, at ¶ 37. We separately address each allegation of ineffective assistance of counsel.

### 1. Severance

{¶ 70} Initially, Powell argues defense counsel rendered ineffective assistance of counsel by failing to file a motion to sever the charges involving each victim so that there would be separate trials. Powell contends that "if counsel had moved to sever the offenses, the motion would have been granted because he was prejudiced by the joinder." He further asserts that "there was a reasonable probability that the verdict would have been different had a motion to sever been made."

> To determine whether defense counsel was ineffective for failing to request severance, we consider whether the failure to file a motion to sever was deficient and, if so, whether Powell was prejudiced by this failure. This analysis, in turn, is based on whether joinder was appropriate in the first place.

*State v. Ford*, 8th Dist. Cuyahoga No. 106394, 2018-Ohio-5169, ¶ 29.

{¶ 71} Crim.R. 8(A) governs the joinder of offenses in a single indictment. Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

{¶ 72} The law favors joining multiple offenses in a single trial if the requirements of Crim.R. 8(A) are satisfied. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565. "[J]oinder and the avoidance of multiple trials [are] favored for many reasons, among which are conserving time and expense, diminishing the inconvenience to witnesses and minimizing the possibility of incongruous results in successive trials before different juries." *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981). *See also State v. Schiebel*, 55 Ohio St.3d 71, 86-87, 564 N.E.2d 54 (1990); *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992).

{¶ 73} Under Crim.R. 14, however, the trial court may grant a severance, if it appears that the defendant would be prejudiced by the joinder. The defendant bears the burden of proving prejudice. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29.

{¶ 74} The state can refute a defendant's claim of prejudice by joinder of multiple offenses in two ways (1) a showing that the evidence of each crime is simple and direct (the "joinder test") or (2) evidence of the other crimes would be admissible even if the counts were severed (the "other acts" test). *State v. Lott,* 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). When the evidence is "simple and direct," an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of the crimes as other acts under Evid.R. 404(B). *Id.* Thus, if the state can meet the requirements of the "joinder test," it need not meet the requirements of the stricter "other acts test." *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 66, citing *State v. Franklin*, 62 Ohio St.3d 118, 122, 580 N.E.2d 1 (1991).

{¶ 75} "Simple and direct" evidence means the evidence of each crime is "so clearly separate and distinct as to prevent the jury from considering evidence of [one crime] as corroborative as the other." *State v. Belle*, 8th Dist. Cuyahoga Nos. 107046 and 107300, 2019-Ohio-787, ¶ 25, citing *State v. Quinones*, 11th Dist. Lake No. 2003-L-015, 2005-Ohio-6576, ¶ 48. Evidence is "simple and direct" if the trier of fact is capable of segregating the proof required for each offense. *Belle* at *id.*, citing *State v. Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379, 937 N.E.2d 136, ¶ 39 (10th Dist.).

{¶ 76} The object of the "simple and direct" test is to prevent the jury from improperly considering evidence of various crimes as corroborative of each other. *State v. Echols*, 128 Ohio App.3d 677, 694, 716 N.E.2d 728 (1st Dist.1998). However,

"[a] trier of fact is believed capable of segregating the proof on multiple charges when the evidence as to each of the charges is uncomplicated." *State v. Lunder*, 8th Dist. Cuyahoga No. 101223, 2014-Ohio-5341, ¶ 33. Thus, "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof." *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 16, citing *State v. Lewis*, 6th Dist. Lucas Nos. L-09-1224 and L-09-1225, 2010-Ohio-4202, ¶ 33.

{¶ 77} After careful consideration, we are unable to conclude that defense counsel rendered ineffective assistance of counsel by failing to file a motion to sever. Here, the allegations of sexual assault in each case relied on testimony and DNA evidence that was simple and direct. *See Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, at ¶ 19 ("[DNA] evidence, although scientific in nature and presented through expert testimony, is simple in its application."). While the prosecution introduced extensive testimony regarding the investigation and forensic analysis performed in each case, the record reflects that the state's witnesses discussed the evidence relating to each victim separately, succinctly, and without significant overlap or conflation of proof.

{¶ 78} Viewed collectively, there was little danger that the jury would confuse the evidence or improperly consider the evidence of each victim's accusations as corroborative of the others. Indeed, although Powell was found guilty for the rape and kidnapping of D.E., the jury found him not guilty of the rape and

kidnapping charges associated with A.W.  This reflects the jury's ability to segregate the proof required in each case.  *See State v. Lee*, 8th Dist. Cuyahoga No. 104682, 2017-Ohio-1449, ¶ 19 (the evidence was "simple and direct" as reflected by the jury acquitting the defendant of offenses relating to one of the several shootings); *State v. Bonneau*, 8th Dist. Cuyahoga No. 97565, 2012-Ohio-3258, ¶ 22 (the jury's not guilty verdict as to the counts relating to one victim and its guilty verdicts as to the counts relating to another demonstrated that the jury was able to separate the evidence and considered each victim separately); *State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 95 (8th Dist.) (defendant could not show prejudice from joinder as he was acquitted of one charge); and *State v. Shivers*, 8th Dist. Cuyahoga No. 106601, 2018-Ohio-5174.

{¶ 79} Because we find that joinder was appropriate in this case, we reject Powell's argument that he was prejudiced by his counsel's failure to request a severance.

## 2. Preindictment Delay

{¶ 80} Powell further contends that defense counsel rendered ineffective assistance of counsel by failing to renew Powell's motion to dismiss based on preindictment delay.

{¶ 81} Here, Powell must demonstrate that his trial counsel performed deficiently by failing to raise the issue of preindictment delay, and that there was a reasonable probability of success had his counsel timely presented that issue to the

trial court. *State v. Mack*, 101 Ohio St.3d 397, 2004-Ohio-1526, 805 N.E.2d 1108, ¶ 31.

{¶ 82} Preindictment delay violates due process only when it is unjustifiable and causes actual prejudice. *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 12. The Ohio Supreme Court has established a burden-shifting framework for analyzing preindictment delay due process claims. *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998). Under this framework, a defendant is first required to present evidence of actual prejudice; if actual prejudice is established, the burden shifts to the state to produce evidence of a justifiable reason for the delay. *Id.*

{¶ 83} The mere "possibility that memories will fade, witnesses will become inaccessible, or evidence will be lost is not sufficient to establish actual prejudice," because those are manifestations of the prejudice inherent in any delay. *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 105, citing *United States v. Marion*, 404 U.S. 307, 326, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). However, the Supreme Court of Ohio has rejected the argument that "any claim of actual prejudice based on the death of a potential witness is too speculative to succeed unless the defendant can establish precisely what that witness would testify to and that the testimony would be directly exculpatory." *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 27. Instead, courts are to undertake a case-by-case consideration of the relevance of the lost evidence and its purported effect

on the defense. *Id.*, citing *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52.

{¶ 84} "Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Jones* at ¶ 28, citing *State v. Luck,* 15 Ohio St.3d 150, 157-158, 472 N.E.2d 1097 (1984). The *Luck* court found that the grounds set forth by the defense in that case — deaths of witnesses, the fading of memories, and the loss of evidence — "when balanced against the other admissible evidence" established that the defendant suffered actual prejudice. *Luck* at 157-158.

{¶ 85} On appeal, Powell asserts that defense counsel's motion to dismiss for preindictment delay was "simply too general" and was premised on a deficient investigation into "who was present before, during and after the respective incidents and whether they would be available for trial." Powell suggests that "had counsel done even a modicum of leg work in advance," counsel would have established actual prejudice and had "a colorable motion to dismiss for preindictment delay."

{¶ 86} After careful consideration of the record and the arguments originally set forth in counsel's motion to dismiss for preindictment delay, we find nothing in this record to support Powell's position that he was prejudiced by unavailable testimony. Without identifying specific individuals or the potential nature of their lost testimony, Powell broadly asks this court to "infer" that there are potentially exculpatory witnesses who are no longer available due to the delayed indictment.

However, the record is silent on this issue. Thus, this court has no information to support Powell's inference that potential defense witnesses have been lost. Moreover, Powell's argument concerning the adequacy of counsel's investigation is equally speculative. Presuming defense counsel exercised reasonable professional judgment, we find nothing in this record to suggest defense counsel did not investigate the availability of all witnesses who might have bolstered Powell's defense or minimized the impact of the state's evidence.

{¶ 87} Under the totality of the circumstances presented in this case, we are unable to conclude that counsel rendered ineffective assistance of counsel by failing to renew or supplement the motion to dismiss for preindictment delay.

{¶ 88} Powell's third assignment of error is overruled.

{¶ 89} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

**MICHELLE J. SHEEHAN, J., and**
**RAYMOND C. HEADEN, J., CONCUR**