[Cite as *State v. Moore*, 2018-Ohio-1825.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 105285

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## CECIL W. MOORE

DEFENDANT-APPELLANT

---

### JUDGMENT:
### REVERSED AND REMANDED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-603417-A

**BEFORE:** Keough, J., Kilbane, P.J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** May 10, 2018

**ATTORNEYS FOR APPELLANT**

Tyresha Brown-O'Neal
614 West Superior Avenue, Suite 1144
Cleveland, Ohio 44113

Allison F. Hibbard
1200 West 3rd Street
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By: Carl Mazzone
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, J.:

{¶1} Defendant-appellant, Cecil Moore appeals his conviction for sexual battery. Finding merit to the appeal, we reverse and remand for further proceedings.

{¶2} In March 2016, Moore was charged rape, sexual battery, and kidnapping; the kidnapping offense contained a sexual motivation specification. The case proceeded to a jury trial where the following evidence was presented.

{¶3} During a lunch hour in the summer of 2015, the victim first met Moore in line at a Wendy's restaurant on the west side of Cleveland. Moore bought her lunch, and the two ate their lunches together, discussed jobs, and exchanged contact information.

{¶4} They spoke a few days later and agreed to meet again. Moore picked the victim up at her apartment, and during the ride to a bar on Euclid Avenue, advised her that he had his firearm on him and showed her his concealed carry license. He stated he told her about the firearm because he did not know if she was comfortable being around a firearm or if she was legally allowed to be around firearms. According to Moore, the victim indicated she had no problem being around the firearm; this was not disputed by the victim.

{¶5} Once at the bar, however, the evening turned out poorly. Moore attempted to purchase the victim a specific drink she wanted. When the victim received her drink, she indicated that it was not the drink she wanted. She attempted to return the drink to the bar, and the victim admittedly got into a verbal altercation with the bartender and manager. When Moore attempted to calm her down and order her another drink, the

victim indicated that a new drink was unacceptable and left the establishment. Although the victim called her brother to pick her up, she ultimately agreed to let Moore take her home. Once at her apartment building, the victim was insistent that they go somewhere else because it was still early. However, Moore did not want to go anywhere else, and instead tried to calm her down by telling her she should just go home. Annoyed, the victim exited Moore's car and drove off in her own car.

{¶6} The victim testified that she subsequently felt bad about how the evening went. On Sunday, August 18, 2015, she contacted Moore to apologize to him and asked him to come over. Moore agreed and arrived at her apartment late that evening. They went to a local store where the victim bought some personal household items, and they each purchased alcoholic beverages. Both testified that a disagreement occurred over purchasing light bulbs — the victim did not want or need Moore to pay for them.

{¶7} Once they arrived back at her apartment, they talked at the kitchen table. Moore was legally carrying his firearm on his hip, and after asking the victim if he could take it off, he placed his gun on the counter. The conversation then continued on the couch. At this point, the version of events is in dispute.

{¶8} According to the victim, the conversation turned to flattery and then sexual. They began kissing and getting undressed. When she asked Moore if he had a condom, he said "no." The victim told him that she would not have unprotected sex with him. According to the victim, Moore became irate and hostile, telling her that unprotected sex was not a big deal. She suggested that he go to the store to purchase a condom.

{¶9} The victim testified that instead of leaving, Moore refused to go to the store and began cursing at her about her philosophy of safe sex. She stated that Moore became more hostile, refusing to leave, yelling that he would leave when he was ready to leave, and that he was not going anywhere. The victim testified that she felt fearful because he was yelling and because she knew he had a gun. Although she said that Moore did not threaten her with the gun, she felt that if she made him angrier, "something [could] happen." (Tr. 186.)

{¶10} The victim stated that she tried to calm Moore down but he became more verbally aggressive toward her, calling her names and berating her about not having condoms herself. Not wanting things to escalate further, she went into her bedroom, disrobed, and offered to perform oral sex on Moore. She testified that she felt that if Moore was sexually gratified, he would leave. Although she did not want to perform oral sex on Moore, she did so out of fear. She stated that Moore was not satisfied by fellatio, critiqued her ability, and wanted sexual intercourse. Unable to get aroused and becoming more fearful, she suggested that they watch pornography on her cell phone. On cross-examination, the victim testified for the first time that following oral sex, Moore digitally penetrated her vagina, causing her pain.

{¶11} The victim testified that Moore, without consent, engaged in sexual intercourse with her. She stated she did not want to have sex with him, but did not say anything and did not fight him off her; however, she testified that she did say "no" at some point. She stated she was "just numb" and kept thinking that Moore had a gun.

Therefore, she felt that if Moore "get[s] what he want[s]," he would leave, and she would be alive. (Tr. 191.) When asked why she did not call for help on her phone instead of viewing pornography, she stated she was too scared — she was afraid he would use his gun.

{¶12} The victim stated that after Moore removed himself from on top of her, he continued to berate her about her sexual abilities and belittle her in general. When Moore went to the bathroom to wash up, the victim repeatedly asked him to leave. Moore eventually left her apartment, but not before he threw bottles of wine coolers at her door and at her. The content of the bottles spilled on the floor and all over her. The victim stated that the entire incident lasted until 3 a.m. on August 19, 2015. Once Moore left, she called her cousin and told her what had happened. Following her conversation with her cousin, she went to bed because she had to go to work that morning.

{¶13} The next morning, the victim took a shower and readied herself for work. She stated that she just wanted to get out of her apartment because of what had happened the night before; she did not want to be there. After working the entire day, she called her brother and her cousin. Based on those conversations, the victim decided to report the incident to Euclid police. At the suggestion of the investigating officer, she also went to Hillcrest Hospital for an examination. The victim testified that she deleted all of Moore's information from her phone, including call history and text messages.

{¶14} Moore testified in his defense. He told the jury he was never convicted of a crime and currently employed by the city of Cleveland, Department of Aging. Moore did

not dispute how he and the victim met. He testified that he bought her lunch, trying to be a gentleman, but then after learning she worked for Cuyahoga County, he believed this connection could "open up a few doors" for him. (Tr. 419.) Moore thought the victim could help him get full-time employment with the county. He stated her connections were the primary reason he went to the bar with her, and why he agreed to go to her apartment even after she acted irrationally at the bar. Moore stated that the victim apologized for her behavior and told him that her job was stressful.

{¶15} Moore also told the jury what occurred at the victim's apartment on August 18, 2015. According to Moore, the victim became sexually aggressive toward him by putting her hand on his leg, rubbing his crotch, and stating she wanted to have sex with him. Moore told her that he was not attracted to her, that he did not want to have sex with her, and that this was not his reason for being there that evening.

{¶16} The victim removed her clothing and used her cell phone to view pornography. Moore testified that he became increasingly uncomfortable when the victim stated that she wanted to see him masturbate. She went into the bathroom, and Moore started putting on his shoes to leave her apartment. The victim came out of the bathroom with a bottle of lotion and requested that he use it to masturbate. According to Moore, he told her she was sick and had mental health issues, and that he was leaving.

{¶17} This caused the victim to become angry and start cursing at him. She started throwing the items he purchased earlier that evening into the hallway, causing Moore to grab the wine coolers she purchased and throwing them as well. Moore

testified that he was upset and admitted that they exchanged vulgarities. He told the jury that he told the victim that he regretted meeting her and that based on her behavior during the first incident at the bar, he should known better than to have agreed to see her again. He said he was present in her apartment for about 30 minutes, and after he left, he deleted her contact information and blocked her from his phone. Moore denied that he had sexual contact or conduct with the victim.

{¶18} On cross-examination, Moore admitted that he had no romantic interest in the victim, but only an interest in her helping him obtain employment with the county. He further admitted that once the victim started becoming sexually aggressive and disrobing, he did not instantly get up from the table and leave the apartment. Moore stated that he did not attempt to leave until she went into the bathroom, and even afterward, he engaged in a verbal altercation with her rather than leaving immediately.

{¶19} Euclid police officer Joseph Parkin testified that he responded on August 19, 2015, to a call regarding a sexual assault. He met the victim at her apartment where she described the details surrounding the incident. Officer Parkin collected a wine glass, a wash cloth from the bathroom, bed sheets, and the clothing the victim was wearing that evening. He recommended to the victim that she visit a sexual assault nurse examiner ("SANE") at Hillcrest Hospital to be examined and for a rape kit to be performed. Officer Parkin admitted that he did not attempt to speak with Moore or the victim's neighbors as part of the investigation.

{¶20} Angelita Olowu, a Hillcrest Hospital SANE nurse, testified that she supervised and oversaw the nurse who examined the victim on August 19-20, 2015. At trial, Olowu identified the victim's medical records, and testified regarding the examination itself, her interactions with the victim, the victim's demeanor, and the findings the examination revealed. Olowu also read to the jury the narrative about the sexual assault that the victim provided during the examination.

{¶21} According to the narrative, the victim stated that Moore began kissing her and tried to remove her clothes, to which she said "no." She stated that he was forceful when he digitally penetrated her vagina, but that they continued to engaged in consensual masturbation. When the victim asked Moore if he had a condom and he said he did not, she told him that she did not engage in unprotected sex. According to the narrative, Moore became angry, hostile, and agitated. The victim told the nurse that they argued about the use of a condom until 2 a.m. and knowing that she needed to work that morning, she offered that Moore could stay on her couch. The victim went to her bedroom, with Moore following. She said they got into bed and Moore was touching her, trying to stimulate her. She told him she did not want to have unprotected sex. Moore then stuck his penis in her vagina and finger in her anus. She stated she became agitated and asked him why he would do those things, and Moore became more agitated and argumentative. The victim stated in the narrative that she thought if they watched pornography he would finish and leave, or she would just perform oral sex on him so that he would leave. She stated she performed oral sex on him because she felt threatened

"because it was late." Afterwards, he cleaned himself up, was verbally aggressive with her, threw alcoholic beverages at her, and ransacked her apartment before leaving.

{¶22} Olowu also testified regarding the various exams that were performed and the collection of evidence from the victim. According to Olowu, the evidence that was collected is part of the sexual assault evidence kit. She identified that swabs were taken from various parts of the victim's body, including her mouth, inner thighs, vagina, anus, breasts, neck, and fingernails. Additionally, various hair clippings were collected.

{¶23} Regarding the physical examination, Olowu stated that the victim had abraded areas to both sides of the vaginal vestibule, or the entryway to the vagina, likely caused by some kind of friction. According to Olowu, the abraded area appears bilateral and symmetrical within the vestibule, revealing that the cause of the friction would have to be something that was centrally located and hitting both sides of the vestibule simultaneously. Olowu admitted, however, that the injury does not reveal when it occurred or whether it was caused by a consensual or nonconsensual act.

{¶24} Sara Horst, forensic scientist at the Bureau of Criminal Identification and Investigation, testified that she conducted forensic analysis on the rape kit, the victim's clothing, a washcloth, and bedding from the victim's bed. She testified that no semen was identified on the clothing, washcloth, or sheets. She further testified that no DNA profiles foreign to the victim were detected from the samples that were submitted for DNA testing. Additionally, no male-specific DNA was present.

{¶25} Euclid police detective Phil Tschetter testified that he was assigned to investigate the incident. He testified that as part of his investigation, he spoke with one of the victim's neighbors attempting to find out if they heard anything that evening. He stated that he was unable to gather any information from anyone from the apartment building that assisted his investigation.

{¶26} On cross-examination, Detective Tschetter admitted that his report reflected that the victim showed "significant reluctance to participate in this investigation to this point" by failing to return phone calls, and her reluctance to speak with him when contact was made. He found this significant because prior to him speaking with her, the victim had called his lieutenant stating she was upset that no one had contacted her. Detective Tschetter further admitted that there was no information or evidence that any DNA linked Moore to the alleged incident.

{¶27} After extensive arguments and consideration, the trial court denied Moore's Crim.R. 29 motion for judgment of acquittal. The defense set forth its case, with Moore testifying in his own defense and Michelle Grande, Moore's girlfriend, testifying as a character witness.

{¶28} The jury found Moore not guilty of rape and kidnapping, but guilty of sexual battery. The court sentenced him to two years of community control sanctions, and classified him as a Tier III sex offender, requiring that he register and report his address with the county sheriff every 90 days for life.

{¶29} Moore appeals, raising two assignments of error, which will be addressed together.

{¶30} In his first and second assignments of error, Moore contends that his conviction for sexual battery is not supported by sufficient evidence and is against the manifest weight of the evidence. The basis for the sexual battery charge was that Moore coerced the victim into performing the act of fellatio.

{¶31} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-829, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶32} In this case, Moore was convicted of sexual battery in violation of R.C. 2907.03(A)(1), which prohibits a person from engaging in sexual conduct with another when the offender knowingly coerces the other to submit by any means that would

prevent resistance by a person of ordinary resolution. Moore challenges on appeal that the state failed to prove the elements of "knowingly coerce."

{¶33} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶34} In this case, the jury was instructed that because it could not look into the mind of another, knowledge is determined from all the facts and circumstances in evidence "whether there existed at the time in the mind of [Moore] an awareness of the probability that he would coerce [the victim] to submit by any means that would have prevented resistance by a person of ordinary resolution." (Tr. 548.)

{¶35} The Revised Code does not define "coercion," but the commentary to R.C. 2907.03 provides that sexual conduct by coercion is somewhat broader than sexual conduct by force. *State v. Ndoji*, 8th Dist. Cuyahoga No. 90181, 2008-Ohio-3551, ¶ 15; *State v. Wilkins*, 64 Ohio St.2d, 382, 386, 415 N.E.2d 303 (1980) ("coercion for purposes of sexual battery is broader than the force required to prove rape and necessarily includes all uses of force. Force is not required to prove coercion.").

{¶36} In *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976), the Ohio Supreme Court described the term "coercion" as follows:

> "Coercion" may include a compulsion brought about by moral force or in some other manner with or without physical force. * * *

These judicial definitions of coercion correspond to the common use of the word. Webster's Third New International Dictionary defines coercion as "the act of coercing: use of physical or moral force to compel to act or assent," and to coerce as "to restrain, control or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)."

The essential characteristic of coercion which emerges from these definitions is that force, threat of force, strong persuasion or domination by another, necessitous circumstances, or some combination of those, has overcome the mind or volition of the [victim] so that [s]he acted other than [s]he ordinarily would have acted in the absence of those influences.

*Id*. at 136-137.

**{¶37}** Additionally, in *State v. Brooks*, 8th Dist. Cuyahoga No. 96552, 2011-Ohio-6643, this court reiterated the Twelfth District's explanation of the element of coercion:

"Coercion for purposes of sexual battery has been defined as 'to compel by pressure.' *See In re Jordan*, [9th Dist. Lorain No. 01 CA007804, 2001 Ohio App. LEXIS 4013 (Sept. 12, 20010]. Webster's Third New International Dictionary (1993) defines 'to coerce' in relevant part as 'to restrain, control, or dominate, nullifying the individual will or desire,' 'to compel to an act of force, threat, or other pressure,' and 'to bring about * * * by force, threat, or other pressure.' *Id*. at 439. Black's Law Dictionary (5th Ed.1979), in turn states that coercion 'may be actual, direct, or positive, as where physical force is used to compel act[s] against one's will, or implied, legal, or constructive, as an where one party is constrained by

subjugation to [an]other to do what his free will would refuse.' *Id.* at 234."

*Id.* at ¶ 34, quoting *In re J.A.S.*, 12th Dist. Warren No. CA2007-04-046, 2007-Ohio-6746, ¶ 19.

**{¶38}** Moore contends on appeal that the evidence was insufficient to support his conviction for sexual battery because no evidence was presented that he knowingly coerced the victim into engaging in sexual conduct. Specifically, he maintains that he never asked the victim to perform oral sex on him, insinuated he wanted oral sex from her, or that he ever threatened or pressured her into performing oral sex on him. Moore's assertions are correct. However, according to the victim, Moore repeatedly told her that he wanted sexual intercourse, insisted on sexual intercourse, and pressured her for sexual intercourse, despite her not wanting to engage in sexual intercourse.

**{¶39}** The victim testified that after she refused to have sex with Moore without a condom, Moore became very hostile. She told him to go to the store to get a condom, but he refused. He also refused to leave the apartment despite being asked several times to do so. She stated she then became fearful because he was yelling and, even though he did not threaten her with his firearm, she felt threatened due to its presence on the table and because Moore had been drinking. The victim maintained that Moore continued to be verbally aggressive towards her, calling her names, and repeating that unprotected sex was not "a big deal." She said that based on her unsuccessful attempts to calm him down, she felt that if she offered to perform oral sex on him, that would satisfy him and

he would leave. She testified that even after she performed oral sex on Moore, he criticized her and stated that he wanted sexual intercourse. When questioned why she performed oral sex on Moore, the victim testified that she did it out of fear and felt pressured to cooperate. She stated that she was trained in crises to deescalate the situation, and she did not feel safe to try to leave — she stated that she was going to do whatever it took for Moore not to pick up the gun. She stated her thoughts were to get Moore out of her apartment and for her to remain alive and unharmed.

{¶40} Accordingly, because the victim testified that she decided to perform oral sex on Moore as a means of escape, survival, or compromise, the fact that Moore did not ask, insinuate, threaten, or pressure her for the specific act of oral sex becomes irrelevant. The victim's testimony about Moore's constant refusal to leave, pacing throughout her apartment, verbal aggression, and persistence if believed by the trier of fact, is sufficient to prove that he acted knowingly.

{¶41} Mindful of the inquiry and standard that this court must apply when reviewing a sufficiency of the evidence challenge, we review the evidence in the light most favorable to the prosecution and ask whether a reasonable juror, who believed the state's evidence could find the essential elements of an offense proven beyond reasonable doubt. We find that a reasonable juror could find that Moore knowingly coerced the victim to engage in sexual conduct, if the jury believed the victim in this case. Accordingly, we find that sufficient evidence was presented to the jury that Moore committed the act of sexual battery, and the first assignment of error is overruled.

**{¶42}** We find, however, that the Moore's conviction for sexual battery is against the manifest weight of the evidence. In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. A manifest weight challenge is a much broader test. *State v. Martin*, 20 Ohio App.3d 172, (1st Dist.1983). The court, sitting as a "thirteenth juror" and reviewing the entire record, "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 388, 678 N.E.2d 541 (1997). A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶43}** In this case, the victim's testimony regarding the entire evening was inconsistent and contradictory. Specifically as it related to the sexual battery count, she gave conflicting testimony regarding when and where oral sex was offered and performed. The victim initially testified that she offered to perform oral sex on Moore in the bedroom on the floor, *prior* to the alleged rape. (Tr. 234-235.) Later, she testified it was on the bed. (Tr. 235.) When it was suggested that she did not offer to perform oral sex on Moore until *after* the alleged rape, she responded that she did not remember that, "I mean right now." (Tr. 241.)

**{¶44}** Moreover, the victim's testimony was vastly different than the details she provided to the SANE nurse a day after the alleged rape. According to the narrative in her medical records, the victim told the nurse that *after* the alleged rape, she thought that maybe if she performed oral sex on him, he would go to sleep. She told the nurse that she "did this because she felt threatened because it was late." (Tr. 309.) And at trial, the victim testified that she offered Moore oral sex because (1) she thought that if she could just "get [Moore] off" he would leave and (2) he had a gun. (Tr. 188, 231.) However, in the victim's medical notes, it was indicated that "patient consented to oral with assailant earlier in the evening prior to the sexual assault."

**{¶45}** The victim's inability to remember the nature of events surrounding the sexual assault makes her testimony even more problematic. When it was suggested that she gave conflicting version of events to the investigating officer, the SANE nurse, and then at trial, she stated, "But you're asking me to recall every single detail of something that happened a year ago. * * * I'm just trying to tell you the truth to what I do remember right now, which may be a little different from that time." (Tr. 236.) However, the victim was able to vividly, clearly, and concisely recall and testify to the exact words and phrases Moore used the entire evening, yet could not remember simple details surrounding the sexual assault or recollect the sequence of events surrounding the sexual assault.

**{¶46}** Finally, despite the victim testifying that Moore was naked throughout her apartment and in her bed, used her bathroom to clean up following intercourse, and that

he vaginally penetrated her with his penis, no DNA evidence was found substantiating the victim's testimony or linking Moore to the alleged offenses.

**{¶47}** Under a manifest weight challenge, this court does not have to view the evidence in the light most favorable to the prosecution. And after weighing the evidence and all reasonable inferences, considering the credibility of witnesses, and resolving conflicts in the evidence, we find that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The evidence presented at trial renders this case the exceptional case in which the evidence weighs heavily against conviction. Accordingly, Moore's conviction is reversed; the second assignment of error is sustained.

**{¶48}** Judgment reversed and remanded for further proceedings.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, JUDGE

MARY EILEEN KILBANE, P.J., and
ANITA LASTER MAYS, J., CONCUR