[Cite as *State v. Watters*, 2022-Ohio-1670.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 110697 |
| v. | : | |
| SAM WATTERS, | : | |
| Defendant-Appellant. | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 19, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-638203-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carl J. Mazzone, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Jonathan Sidney, Assistant Public Defender, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Sam Watters ("Watters"), appeals his convictions for sexual battery, gross sexual imposition, and attempted gross sexual

imposition for an incident involving his niece ("Niece") on July 26, 2018. For the reasons set forth below, we affirm.

{¶ 2} On March 21, 2019, Watters was charged with rape in violation of R.C. 2907.02(A)(2), a first-degree felony, with a notice of prior conviction specification and a repeat violent offender specification (Count 1); gross sexual imposition ("GSI") in violation of R.C. 2907.05(A)(1), a fourth-degree felony (Count 2); and attempted GSI in violation of R.C. 2923.02 and 2907.05(A)(1), a fifth-degree felony (Count 3). Each of the counts also carried a sexually violent offender specification.

{¶ 3} On June 24, 2021, Watters waived his right to a jury and the matter proceeded to a bench trial. The state of Ohio presented testimony from four witnesses: Niece, Niece's brother D.T., Niece's mother A.T., and Detective Richard Durst ("Detective Durst") of the Cleveland Sex Crimes and Child Abuse Unit.

{¶ 4} Niece was 16 years old at the time of the incident but 19 years old at the time of trial. Niece testified that her father was murdered in 2004, when she was four years old, and she had a vague recollection of meeting Watters, her father's only brother, at that time. Unlike her relationship with Watters, Niece had maintained a relationship with two paternal aunts, one of whom gave Watters Niece's cellphone number in 2018, after Watters indicated that he wanted to reconnect with his brother's family. Niece admitted that when Watters called her, she was at first eager to meet him and learn more about her father. During their first meeting, Watters took Niece, one of her brothers, and her mother A.T. to get ice cream.

{¶ 5} Niece stated that a few weeks later, Watters called her again and invited her to come stay the weekend at his home in Cleveland and attend church with him. Watters and his wife picked Niece up because A.T. does not drive. Niece testified that while she was at Watters's house, she ate dinner with Watters, his wife, and his wife's two granddaughters; watched television; and slept on a couch in Watters's living room. That Sunday, Watters took Niece to church, where he introduced her to the congregation and shared that her father had been murdered. Watters drove Niece home on Monday morning. She testified that they had not talked very much about her father over the weekend.

{¶ 6} A few weeks after her first visit, Watters again invited Niece to his house for the weekend. Niece recalled that Watters, his wife, and one of her granddaughters picked her up around 8:00 p.m. on Thursday, July 26, 2018. After arriving at Watters's house, Watters's wife picked up food for the family and then left the house. Niece testified that after dinner, the granddaughters went upstairs, and Niece called her cousin from the living room couch where she spent the night the last time she stayed. Niece recalled that Watters entered the living room and asked her to get off the phone. Niece told her cousin she would call her back. Niece stated that Watters informed her that A.T. was concerned about social media posts that revealed Niece was sexually active and that A.T. had asked Watters to talk to Niece about it.

{¶ 7} Niece testified that Watters had a tube of Eucerin cream with him and, at some point during their conversation, he pulled up his shirt and asked Niece

to rub the cream on his shoulder. She stated that the request made her feel awkward and uncomfortable, but she said nothing and did it. Niece testified that Watters then pulled up his shorts and asked her to rub the cream on his thighs and, again, she said nothing and did it. Niece testified that Watters next rubbed the cream on Niece's breasts under her bra and on her inner thighs and then began rubbing her vagina on the outside of her shorts before pulling the leg of her shorts aside and digitally penetrating her vagina. Niece stated that she did not want Watters to touch her but said nothing because she froze in fear and shock. When asked why she had not left the room, screamed, or told Watters to stop, Niece replied that she did not know if Watters "might hurt" her and said she "had a bad feeling." Niece said that while Watters was touching her, he pulled out his erect penis and instructed her to grab it. She said nothing and did it. Shortly after, Watters left the room.

{¶ 8} Niece remembered that after Watters left the room, she called her cousin back and told her that Watters had touched her. Niece also texted her oldest brother D.T. at 5:13 p.m., asking him to pick her up and sending her location.[1] Niece recalled that approximately 20 minutes later, Watters returned to the living room with his wife, instructed Niece to gather her things, and drove her home. During the drive, Watters remained quiet, and Watters's wife asked Niece what was wrong. The next day, A.T.'s friend drove Niece and A.T. to the police station to file a report. The

---

[1] On cross-examination, Niece stated that the incident had occurred in the spring or fall, sometime the afternoon around 2:00 p.m.

police did not advise Niece to get a rape-kit examination or request the clothing Niece had worn the night before.

{¶ 9} D.T. testified that upon receiving the 5:13 p.m. text message, he and A.T. drove from their home in Elyria to Cleveland to pick up Niece, but Watters had already left to take Niece home to Elyria. A.T. testified that she had permitted Niece to visit Watters for the weekend to attend church with him and his wife. She admitted that she had asked Watters to talk to Niece about her sexual activity because of Watters's ties to the church and because Niece's father could not have that conversation with her. A.T. stated that Niece had planned to stay at Watters's house through the weekend but returned home the same day. When A.T. and D.T. returned to Elyria from Cleveland, Niece was there waiting for them and appeared to be upset.

{¶ 10} Detective Durst testified that he had reviewed Niece's initial report and interviewed Niece and A.T. on August 1, 2018. Following the interview, Detective Durst prepared a supplemental report, which the state used to refresh his recollection at trial.[2] In the report, Niece states that she at first refused Watters's request to rub Eucerin cream on her body; that he nevertheless rubbed the cream on her arms and thighs; that he rubbed her vagina over her shorts; and that he pulled out his penis and asked her to grab it, she said no, and he stopped. A.T. stated that

---

[2] Both the initial report and Detective Durst's supplemental report were produced in discovery, but neither report was included in the record. On October 15, 2021, this court granted Watters's motion to supplement the record and compel production of the supplemental report.

Watters also touched Niece's breasts, put his hands in her pants and "finger[ed]" her, and then took his penis out and tried to force Niece to touch it but she pulled away. On cross-examination, counsel for Watters attempted to ask Detective Durst about the contradiction between Niece's testimony that she had grabbed Watters's penis and her report to Detective Durst that she had refused to do so. His answer was cut short by the state's objection, which the trial court sustained.

{¶ 11} At the conclusion of the state's evidence, counsel for Watters moved for judgment of acquittal on all counts pursuant to Crim.R. 29. The trial court denied the motion. Watters did not call any witnesses for the defense and rested. He renewed his Crim.R. 29 motion, which the trial court denied.

{¶ 12} Before closing argument, the state moved to amend Count 2, GSI, to add "breasts and vaginal area" to the indictment based on Niece's testimony at trial and asked that the trial court consider the lesser-included offense of sexual battery in violation of R.C. 2907.03 (A)(1) under Count 1. Counsel for Watters did not object. The trial court granted the motion. During closing argument, counsel for Watters contended that the state produced no independent evidence to corroborate Niece's allegations. The state responded that Niece stuck with the case for nearly three years through COVID-19 delays and that while the case rested on Niece's testimony, Niece had texted D.T. within minutes and reported the matter to police the next day and her statements remained consistent throughout.

{¶ 13} On June 29, 2021, the trial court found Watters guilty of sexual battery with a notice of prior conviction (Count 1), GSI (Count 2, as amended), and

attempted GSI (Count 3). The trial court stated that the repeat violent offender specification in Count 1 did not apply because sexual battery is a third-degree felony. The trial court found Watters not guilty of the sexually violent predator specifications in all counts. In its sentencing entry, the trial court imposed "a term of four years on Count 1, a term of 18 months on Count 2, a term of 12 months on Count 3, all terms to be served concurrently with each other; determined [Watters] to be a Tier III sex offender / child offender registrant;" and credited Watters with 21 days of jail time.

{¶ 14} It is from this judgment that Watters now appeals, raising three assignments of error, which shall be addressed out of order for ease of discussion:

> Assignment of Error I: Mr. Watters' convictions were against the manifest weight of the evidence.

> Assignment of Error II: Mr. Watters' trial counsel rendered constitutionally ineffective assistance of counsel at trial.

> Assignment of Error III: There was insufficient evidence to permit the trier of fact to find beyond a reasonable doubt that Mr. Watters committed any of the charged offenses.

{¶ 15} In the third assignment of error, Watters argues that the state produced insufficient evidence of sexual battery because the state relied entirely on Watters's position of authority over Niece to prove coercion. Watters also argues that the state produced insufficient evidence of GSI and attempted GSI because the state failed to proffer any evidence showing that Watters had compelled Niece to submit to sexual contact by force or threat of force. The state argues that there was sufficient evidence of coercion because Niece viewed Watters as a father figure, was

a guest in Watters's home, had been brought there by Watters, was alone when Watters entered the room, was instructed by Watters to put her cell phone away, and was shocked when talk of sex turned into touching. The state contends that Niece froze, having no time to think about how she could resist. The state maintains that the same evidence establishing coercion also establishes force or threat of force, which can be subtle and psychological.

{¶ 16} A challenge to the sufficiency of the evidence questions whether the state has met its burden of production. *State v. Swanson-Reed*, 8th Dist. Cuyahoga No. 110724, 2022-Ohio-1401, ¶ 12, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to support a conviction is a question of law. *Thompkins* at 386. "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Id.* When reviewing a sufficiency challenge, the reviewing court must examine the evidence admitted at trial and determine "whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "[T]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Thompkins* at 386. The question is not "'whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.'" *Swanson-Reed* at ¶ 12, quoting *Thompkins* at 390.

{¶ 17} Watters first challenges the sufficiency of the evidence supporting his sexual battery conviction. Sexual battery by coercion under R.C. 2907.03(A)(1) is the lesser included offense of rape. *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 268. Sexual battery requires proof that the offender engaged in "sexual conduct" with another who is not his spouse by "knowingly coerc[ing] the other person to submit by any means that would prevent resistance by a person of ordinary resolution." R.C. 2907.03(A)(1). *State v. Parker*, 8th Dist. Cuyahoga No. 110563, 2022-Ohio-377, ¶ 15. "Sexual conduct" includes digital penetration of the vagina. R.C. 2907.01(A); *State v. Palmer-Tesema*, 8th Dist. Cuyahoga No. 107972, 2020-Ohio-907, ¶ 71.

{¶ 18} The Revised Code does not define "coercion" or "ordinary resolution." When the General Assembly does not define a word or phrase, that word or phrase is given its ordinary meaning. *State v. Taylor*, 8th Dist. Cuyahoga No. 78383, 2001 Ohio App. LEXIS 2513, 8 (June 7, 2001). "As used in the context of R.C. 2907.03(A)(1), resolution means a firmness of purpose [and] an ability to resist coercion." *Id.* As provided by the commentary to R.C. 2907.03, sexual conduct by coercion is broader than sexual conduct by force, does not require proof of force, and "'necessarily includes all uses of force.'" *State v. Ford*, 8th Dist. Cuyahoga No. 107541, 2019-Ohio-2570, ¶ 21, quoting *State v. Wilkins*, 64 Ohio St.2d 382, 386, 415 N.E.2d 303 (1980).

{¶ 19} The Ohio Supreme Court has defined "coercion" to include "'a compulsion brought about by moral force or in some other manner with or without

physical force'" and has explained that it is an "'essential characteristic of coercion'" that "'force, threat of force, strong persuasion or domination by another, necessitous circumstances, or some combination of those, has overcome the mind or volition of the [victim] so that [s]he acted other than [s]he ordinarily would have acted in the absence of those influences.'" *Ford* at ¶ 22, quoting *State v. Woods*, 48 Ohio St.2d 127, 137, 357 N.E.2d 1059 (1976). The Ohio Supreme Court has also recognized both the "coercion inherent in parental authority" and that "[f]orce need not be overt and physically brutal, but can be subtle and psychological." *State v. Eskridge*, 38 Ohio St.3d 56, 58, 526 N.E.2d 304 (1988).

{¶ 20} In *Ford*, this court reiterated the definition of coercion provided by *In re J.A.S.*, 12th Dist. Warren No. CA2007-04-046, 2007-Ohio-6746:

> "Coercion for purposes of sexual battery has been defined as 'to compel by pressure.' *See In re Jordan* (Sept. 12, 2001), Lorain App. No. 01CA007804, 2001 Ohio App. LEXIS 4013. Webster's Third New International Dictionary (1993) defines 'to coerce' in relevant part as 'to restrain, control, or dominate, nullifying the individual will or desire,' 'to compel to an act by force, threat, or other pressure,' and 'to bring about * * * by force, threat, or other pressure.' *Id.* at 439. Black's Law Dictionary (5th Ed.1979), in turn, states that coercion 'may be actual, direct, or positive, as where physical force is used to compel [an] act against one's will, or implied, legal, or constructive, as where one party is constrained by subjugation to [an]other to do what his free will would refuse.' *Id.* at 234."

*Ford* at ¶ 23; *State v. Moore*, 2018-Ohio-1825, 112 N.E.3d 76, ¶ 37 (8th Dist.).

{¶ 21} Here, Niece testified that Watters entered the living room where she stayed and slept when she visited Watters, asked her to end her phone conversation with her cousin, began talking to her about her interest in sex, called her over to sit

by him, and engaged her in increasingly sexualized touching before digitally penetrating her vagina. Niece stated that she rubbed Eucerin cream on Watters's shoulder and thighs when he asked her to do so, even as these requests made her feel uncomfortable. Niece also stated that she did not leave the room or tell Watters to stop when he began touching her because she froze in shock and fear. Niece further testified that she "had a bad feeling" and did not know if Watters "might hurt her." Collectively, this testimony is sufficient to establish coercion. *See In re J.A.S.* at ¶ 22 (finding that the victim's "inability to react verbally or physically during and after the incident clearly indicate[d] she was 'frozen' and overwhelmed by [the] appellant's actions").

{¶ 22} Watters argues that the state solely relied on evidence of Watters's authority as a father figure and occasional preacher at his church to prove the element of coercion. *See State v. Bajaj*, 7th Dist. Columbiana No. 03 CO 16, 2005-Ohio-2931, ¶ 24 ("a defendant has not committed sexual battery if the only evidence of coercion is the relationship between the defendant and the victim unless the statute specifically provides otherwise"). This argument is unavailing for two reasons. First, Watters was convicted of sexual conduct with Niece by coercion under R.C. 2907.03(A)(1), not sexual conduct with Niece while acting in loco parentis under R.C. 2907.03(A)(5) or as the pastor of her church under R.C. 2907.03(A)(12). Second, Niece's testimony that she initially visited Watters to learn more about her deceased father and attend church with Watters does not necessarily mean that she saw Watters as a father figure or spiritual leader, but it does add to

Watters's authority as a 55-year-old uncle who took a belated interest in his 16-year-old niece's life, offered to advise her, invited her to his home, and drove her there and back because her mother does not drive.

{¶ 23} Such a combination of factors, though subtle and psychological, could cause a person of ordinary resolution to freeze in fear and shock and submit to touching that her free will might otherwise refuse. *Eskridge*, 38 Ohio St.3d at 58, 526 N.E.2d 304; *In re J.A.S.*, 2007-Ohio-6746, at ¶ 19. Therefore, viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to permit the trial court to convict Watters of sexual battery.

{¶ 24} Watters next challenges the sufficiency of the evidence supporting his convictions for GSI and attempted GSI. GSI requires proof that the offender engaged in "sexual contact" with another who is not his spouse by "purposely compel[ling] the other person * * * to submit by force or threat of force." R.C. 2907.05(A)(1). "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B); *State v. Welch*, 8th Dist. Cuyahoga No. 93035, 2010-Ohio-1206, ¶ 22.

{¶ 25} "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person." R.C. 2901.01(A)(1). Use of the word "any" in the definition of "force" recognizes that the degree and manner of force necessary to commit a sex offense may vary depending on the offense,

victim, and circumstances. *State v. Fortson*, 8th Dist. Cuyahoga No. 92337, 2010-Ohio-2337, ¶ 84; *State v. Lillard*, 8th Dist. Cuyahoga No. 69242, 1996 Ohio App. LEXIS 2150, 15 (May 23, 1996). Within the definition of force is "compulsion," which "'can take other forms than physical force; but in whatever form it appears * * * [i]t can best be considered under the heads of obedience to orders, material coercion, duress per minas, and necessity.'" *State v. Stevens*, 2016-Ohio-446, 58 N.E.3d 584, ¶ 19 (3d Dist.), quoting Black's *Law Dictionary* 348 (14th Ed.2014).

{¶ 26} Here, Niece testified that Watters became aroused after touching her breasts, thighs, and vagina. Watters also asked Niece to grab his erect penis, which Niece did before pulling her hand away. Such touching constitutes sexual contact within the meaning of the statute. Niece was also a guest in Watters's home, and Watters waited until Niece was alone in the living room doubling as her bedroom before asking her to end her phone call so that he could have a talk with her about sex. Though he was an uncle, not a parent, Watters had A.T.'s permission to talk to Niece about sex. Watters took advantage of whatever authority he had in this situation, quickly turning the interaction from conversation to touching. *See, e.g., Welch* at ¶ 16-17 (affirming a GSI conviction based in part on the psychological force inherent in an uncle's authority over his 14-year-old niece and the niece's fear of the uncle). Niece testified that she had complied with Watters's requests because she feared what he might do to her. She also testified that she froze when Watters began touching her. *See id.*; *see also State v. Pate*, 8th Dist. Cuyahoga No. 90093, 2008-

Ohio-2934, ¶ 25 (noting that the victim feared her mother's boyfriend even though she did not consider him a father figure or a disciplinarian).

{¶ 27} Therefore, viewing the evidence in a light most favorable to the prosecution, Watters's authority over Niece, Niece's fear of Watters, and the situation in which Watters placed Niece when he touched her were sufficient evidence to permit the trial court to convict Watters of GSI for touching Niece's breasts, thighs, and vagina and attempted GSI for compelling Niece to touch his penis.

{¶ 28} Watters's third assignment of error is overruled.

{¶ 29} We turn next to Watters's first assignment of error. Within his first assignment of error, Watters argues that his convictions were against the weight of the evidence because Niece's testimony was fatally inconsistent. Watters contends that Niece, the state's only witness to the touching, contradicted herself when she told police that Watters had rubbed her vagina outside her clothing but testified that Watters had digitally penetrated her. Watters also contends that Niece provided conflicting testimony concerning when the incident occurred, stating on direct examination that Watters picked her up at 8:00 p.m. that evening, stating on cross-examination that the incident occurred around 2:00 p.m. in the afternoon, and providing a text message showing that the incident occurred sometime around 5:13 p.m. Watters also points to other inconsistencies in Niece's testimony, such as the number of times she had visited Watters's house before the incident and whether the shorts she wore at the time of the incident were tight- or loose-fitting. Watters

maintains that the lack of corroborating evidence, such as Niece's clothing or DNA evidence, increases the weight of these inconsistencies. The state argues that Niece's testimony at trial was corroborated by the text message to her brother immediately following the incident and the report she made to the police the day after the incident. The state maintains that minor inconsistencies in the testimony of a 16-year-old victim of sexual abuse by a family member do not undermine the trial court's fact determinations.

{¶ 30} We note that an appellate court may determine that the evidence is legally sufficient to sustain the verdict but nevertheless conclude that the verdict is against the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Unlike a sufficiency challenge, which questions whether the state has met its burden of production, a manifest weight challenge questions whether the state has met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13, citing *Thompkins* at 390. "'[W]eight of the evidence involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *Thompkins* at 387. "Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's?" *State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. A reversal on the basis that a verdict is against the weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against

the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). When reviewing a challenge to the weight of the evidence following a bench trial, we recognize the trial court is serving as factfinder:

> "Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."

*State v. Ferguson*, 8th Dist. Cuyahoga No. 108603, 2020-Ohio-3119, ¶ 22, quoting *State v. Bell*, 8th Dist. Cuyahoga No. 106842, 2019-Ohio-340, ¶ 41.

{¶ 31} Here, Watters highlights inconsistencies between Niece's testimony that Watters digitally penetrated her and Detective Durst's supplemental report stating that Watters had rubbed her vagina outside her clothing. Watters argues that Niece's inconsistency about whether Watters had digitally penetrated her undermines his sexual battery conviction. Watters also argues that Niece's inconsistent statements discredit her testimony supporting Watters's convictions for GSI and attempted GSI.

{¶ 32} Niece's initial report the day after the event is not part of the record. The alleged inconsistency appears in Detective Durst's written summary of a recorded interview he held with Niece a few days after the event. Like the initial report, the recording of this interview is not part of the record. Without Niece's actual statements to police, the supplemental report does not show a patent inconsistency between Niece's statements to police and her testimony at trial. Even

assuming Detective Durst's summary provides a nearly verbatim restatement of what Niece stated during the interview, it does not necessarily follow that the summary's omission of digital penetration from its description that Watters had rubbed Niece's vagina on top of her shorts constitutes an inconsistency. *See State v. Rodriguez*, 8th Dist. Cuyahoga No. 109320, 2021-Ohio-2580, ¶ 57 ("This court has observed that a witness'[s] testimony at trial that includes details that were not included in a police interview does not necessarily constitute a material inconsistency."); *see also State v. Kenney*, 8th Dist. Cuyahoga No. 80653, 2004-Ohio-972, ¶ 9, quoting *State v. Hartford*, 21 Ohio App.3d 29, 31, 486 N.E.2d 131 (8th Dist.1984) ("'Certain details related to the police may naturally not be brought up on direct examination and some details omitted from a witness statement may naturally crop up for the first time at trial, and it is not appropriate to consider the omission of such details to be "inconsistencies.""'). Further, the same supplemental report that Watters would use to impeach Niece's testimony also includes a written summary of A.T.'s interview describing that Watters had "finger[ed]" Niece, corroborating that testimony.

{¶ 33} Watters also points to inconsistencies in the time Niece believed the event occurred. Niece's testimony that the touching occurred sometime after 8:00 p.m. or sometime in the afternoon, perhaps 2:00 p.m., does conflict with her 5:13 p.m. text message to D.T. shortly following the event. However, her text message to D.T. within minutes of Watters's leaving the room, her telling A.T. about the incident when she arrived home to Elyria, and the report she filed the following

day carry greater weight than her ability to recall — three years later — the event's exact time, how often she had visited Watters's home before it occurred, or whether her shorts were tight- or loose-fitting on that day.

{¶ 34} We therefore cannot conclude that Watters's convictions were against the weight of the evidence or that the trial court clearly lost its way.

{¶ 35} Watters's first assignment of error is overruled.

{¶ 36} We turn last to Watters's second assignment of error. Within his second assignment of error, Watters argues that his trial counsel was ineffective for failing to impeach Niece using Detective Durst's supplemental report. Watters maintains that his trial counsel's closing argument exacerbated this failure by failing to highlight Niece's inconsistency and unreliability, especially in light of the state's closing argument that Niece remained consistent throughout. The state argues that the supplemental report on which Watters bases his argument was never admitted into evidence, merely marked for identification and used to refresh the detective's recollection. The state maintains that this supplemental report is not part of the record and cannot be reviewed by this court. The state also argues that defense counsel's decision not to attack Niece's credibility in his closing argument was a strategic choice.

{¶ 37} To establish ineffective assistance of counsel, Watters must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 98, citing

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), citing *Strickland a*t 697.

{¶ 38} A licensed attorney is presumed to be competent, and a defendant claiming ineffective assistance bears the burden of proof. *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 35 (8th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). "'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 69 (8th Dist.), quoting *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69. "Trial counsel's strategic choices must be accorded deference and cannot be examined through the distorting effect of hindsight." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 115, citing *Strickland* at 689 and *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992). "'Debatable trial tactics do not constitute [ineffective] assistance.'" *State v. Williams*, 8th Dist. Cuyahoga No. 97730, 2012-Ohio-4277, ¶ 18, quoting *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). Whether or how to impeach a witness is a trial tactic. *Id.*; *State v. Artis*, 6th Dist. Lucas No. L-19-1267, 2021-Ohio-2965, ¶ 79. "Additionally, the failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial." *Powell* at ¶ 69, citing *State v. Kilbane*, 8th Dist. Cuyahoga No. 99485, 2014-Ohio-1228, ¶ 37.

{¶ 39} Here, Watters contends that his counsel failed to impeach Niece on cross-examination using the supplemental report and failed to raise Niece's inconsistent statements in closing argument. As explained above, the supplemental report is Detective Durst's written summary of his recorded interview with Niece. "Generally, a written summary of a witness's statement contained in a police report is not a statement which can be used to impeach the witness." *State v. Thomas*, 9th Dist. Lorain No. 92CA005505, 1993 Ohio App. LEXIS 4046, 7 (Aug. 18, 1993), citing *State v. Johnson*, 62 Ohio App.2d 31, 36, 403 N.E.2d 1003 (6th Dist.1978). Even assuming this summary closely restates the substance of Niece's statements, the omission does not necessarily establish an inconsistency. *See Rodriguez*, 2021-Ohio-2580, at ¶ 57; *Kenney*, 2004-Ohio-972, at ¶ 9. Nor, standing alone, does the omission's exclusion from counsel's cross-examination of Niece reveal that counsel was unmindful that a sexual battery conviction would hinge in part on the consistency of Niece's testimony that Watters digitally penetrated her.

{¶ 40} The record also reveals that counsel for Watters did use the supplemental report to cross-examine Niece about inconsistencies in her statements to police:

Counsel: Do you recall telling the detective and the police officer, the uniformed police officer that took the report, that you said no when he tried to get you to touch his penis?

Niece: No.

Counsel: But you did give a statement, right?

Niece: Yes.

(Tr. 163, Sept. 4, 2019).

{¶ 41} Niece recalled giving a statement to police but did not recall the details. Counsel then attempted to impeach Niece while cross-examining Detective Durst:

Counsel: Would it be fair to say that there are several statements from [Niece] in [your supplemental report] where she indicates that she specifically said no to something she claims my client was asking her to do?

           * * *

State: Objection. The testimony is the testimony. He could have impeached the witness.

Counsel: I'm impeaching the witness through another witness.

           * * *

Court: Sustained.

(Tr. 248, Sept. 4, 2019).

{¶ 42} In addition to the problems inherent in impeaching Niece by Detective Durst's summary of her recorded statements, the state charged Watters with attempted GSI for the conduct at issue in these lines of questioning, which renders the question of whether Niece touched Watters's penis when he instructed her do so not only irrelevant to the charge, but also hearsay if offered for its truth. *See State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 46 (6th Dist.), fn. 4 ("Except for prior inconsistent statements that meet the special criteria of Evid.R. 801(D)(1)(a) or satisfy the conditions of a hearsay exception, impeaching statements are not, and may not be relied upon as, substantive proof.").

Further, Watters's contention that counsel should have highlighted these alleged inconsistencies in his closing argument also overlooks that counsel's questions are not evidence. *State v. Siller*, 8th Dist. Cuyahoga No. 90865, 2009-Ohio-2874, ¶ 58.

{¶ 43} Watters's ineffective assistance claim is at best predicated on conjecture that had counsel referenced an omission rather than an inconsistency in Detective Durst's written summary, the trial court might have been inclined to discredit Niece's testimony. *See Williams*, 2012-Ohio-4277, at ¶ 18 (a debatable trial tactic). Alternatively, Watters's ineffective assistance claim is predicated on an impeachment attempt rejected by the trial court and not referenced by counsel in closing argument. *See Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, at ¶ 69 (a futile act). These arguments demonstrate neither deficient performance of counsel nor prejudice to Watters so as to deprive him of a fair trial. Therefore, Watters has failed to establish that counsel's use of Detective Durst's supplemental report constitutes ineffective assistance of counsel.

{¶ 44} Watters's second assignment of error is overruled.

{¶ 45} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.


_____
MARY J. BOYLE, JUDGE

SEAN C. GALLAGHER, A.J., and
EMANUELLA D. GROVES, J., CONCUR